# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 18-0411V
UNPUBLISHED

| | |
|---|---|
| AMBER ETHERIDGE,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: June 28, 2022<br><br>Special Processing Unit (SPU);<br>Attorney's Fees and Costs;<br>Reasonable Basis; Influenza (Flu)<br>Vaccine; Guillain-Barré Syndrome<br>(GBS) |

*Milton Clay Ragsdale, IV*, Ragsdale LLC, Birmingham, AL, for Petitioner.

*Darryl R. Wishard*, U.S. Department of Justice, Washington, DC, for Respondent.

**DECISION ON ATTORNEY'S FEES AND COSTS**[1]

On March 19, 2018, Amber Etheridge filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). "Petitioner alleges that she incurred Guillain-Barré syndrome due to an influenza ("flu") vaccine she received on September 24, 2012, casting her claim as a Table injury under 42 U.S.C. §300aa-14, as amended effective March 21, 2017." Petition at ¶ 7.

On October 30, 2020, I issued a decision dismissing Petitioner's case based upon untimeliness and a failure to satisfy the statutory six-month severity requirement. ECF No. 40. Judgment entered on December 2, 2020. ECF No. 42.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

On May 26, 2021, Petitioner filed a motion for attorney's fees and costs, requesting an award of $39,779.75. ECF No. 43. Maintaining that Petitioner lacked a reasonable basis for his claim, Respondent opposes an award of attorney's fees and costs. ECF No. 44. On June 7, 2021, Petitioner filed his reply, addressing Respondent's arguments and requesting an additional award of $1,560.00 for time expended preparing the reply. ECF No. 45.

For the reasons discussed below, Petitioner has failed to establish there was a reasonable basis for her claim. Thus, she is not entitled to an award of attorney's fees and costs, and the fees motion is denied.

## I.   Applicable Legal Standards

Motivated by a desire to ensure that petitioners have adequate assistance from counsel when pursuing their claims, Congress determined that attorneys' fees and costs may be awarded even in unsuccessful claims. H.R. REP. NO. 99-908, at 22 *reprinted in* 1986 U.S.C.C.A.N. 6344, 6363; *see also Sebelius v. Cloer*, 133 S.Ct. 1886, 1895 (2013) (discussing this goal when determining that attorneys' fees and costs may be awarded even when a petition was untimely filed). As Judge Lettow noted in *Davis*, "the Vaccine Program employs a liberal fee-shifting scheme." *Davis v. Sec'y of Health & Hum. Servs.*, 105 Fed. Cl. 627, 634 (2012). It may be the only federal fee-shifting statute that permits unsuccessful litigants to recover fees and costs.

However, Congress did not intend that *every* losing petition be automatically entitled to attorney's fees. *Perreira v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994). And there is also a prerequisite to even obtaining fees in an unsuccessful case. The special master or court may award attorney's fees and costs in a case in which compensation was not awarded only if "that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." Section 15(e)(1). Reasonable basis is a prerequisite to a fee award for unsuccessful cases – but establishing it does not automatically *require* an award, as special masters are still empowered by the Act to deny or limit fees. *James-Cornelius on behalf of E. J. v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374, 1379 (Fed. Cir. 2021) ("even when these two requirements are satisfied, a special master retains discretion to grant or deny attorneys' fees").

As the Federal Circuit explained, whether a discretionary fees award is appropriate involves two distinct inquiries – a subjective one when assessing whether a petition was brought in good faith, and an objective one when ascertaining whether reasonable basis existed. *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 635 (quoting *Chuisano*

*v. Sec'y of Health & Hum. Servs.*, 116 Fed. Cl. 276, 289 (2014)). "Good faith is a subjective test, satisfied through subjective evidence." *Cottingham v. Sec'y of Health & Hum. Servs.,* 971 F.3d 1337, 1344 (Fed. Cir. 2020) ("*Cottingham I*"). "[T]he 'good faith' requirement . . . focuses upon whether petitioner honestly believed he had a legitimate claim for compensation." *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-0544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007).

Cases in which good faith has been found to be lacking often involve petitioners who failed to produce or actively concealed evidence undermining their claims. *Purnell-Reid v. Sec'y of Health & Hum. Servs.,* No. 18-1101V, 2020 WL 2203712 (Fed. Cl. Spec. Mstr. Apr. 6, 2020); *Crowding v. Sec'y of Health & Hum. Servs.,* No. 16-0876V, 2019 WL 1332797 (Fed. Cl. Spec. Mstr. Feb. 26, 2019); *Heath v. Sec'y of Health & Hum. Servs.*, No. 08-0086V, 2011 WL 4433646 (Fed. Cl. Spec. Mstr. Aug. 25, 2011); *Carter v. Sec'y of Health & Hum. Servs.*, No. 90-3659V, 1996 WL 402033 (Fed. Cl. Spec. Mstr. July 3, 1996).

"Additionally, a petitioner's attorney's conduct may also be relevant when evaluating good faith." *Purnell-Reid*, 2020 WL 2203712, at *6. "Counsel still have a duty to investigate a Program claim even if they reasonably find their client to be a credible individual." *Cortez v. Sec'y of Health & Hum. Servs.*, No. 09-0176V, 2014 WL 1604002, at *8 (Fed. Cl. Spec. Mstr. Mar. 26, 2014). Factors, such as a looming statute of limitations and the conduct of counsel, are properly considered when determining whether good faith exists – but *do not bear* on the claim's objective basis. *Simmons,* 875 F.3d at 636; *Amankwaa v. Sec'y of Health & Hum. Servs.*, 138 Fed. Cl. 282, 289 (2018) ("the effort that an attorney makes to investigate a claim or to ensure that a claim is asserted before the expiration of the statutory limitations period . . . are properly evaluated in determining whether a petition was brought in good faith").

Reasonable basis looks to objective proof in the record in support of a claim. *Cottingham I,* 971 F.3d at 1344. The reasonable basis requirement thus examines "not at the likelihood of success [of a claim] but more to the feasibility of the claim." *Turner*, 2007 WL 4410030, at *6 (quoting *Di Roma v. Sec'y of Health & Hum. Servs.,* No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)). The Federal Circuit recently explained "that a reasonable basis analysis is limited to objective evidence, and that subjective considerations, such as counsel's subjective views on the adequacy of a complaint, do not factor into a reasonable basis determination." *James-Cornelius*, 984 F.3d at 1379.

Although clearly easier to meet than the preponderant standard required for compensation, "courts have struggled with the nature and quantum of evidence necessary to establish a reasonable basis." *Wirtshafter v. Sec'y of Health & Hum. Servs.,*

155 Fed. Cl. 665 at 671 (Fed. Cl. 2021). "[I]t is generally accepted that 'a petitioner must furnish *some evidence* in support of the claim.'" *Id.* (quoting *Chuisano,* 116 Fed. Cl. at 288, emphasis added in *Wirtshafter*). Citing the *prima facie* elements of a successful claim described in Section 11(c)(1), the Federal Circuit recently instructed that the level of the objective evidence sufficient for a special master to find reasonable basis should be "more than a mere scintilla but less than a preponderance of proof." *Cottingham I*, 971 F.3d at 1345-46. "This formulation does not appear to define reasonable basis so much as set its outer bounds." *Cottingham v. Sec'y of Health & Hum. Servs.,* 159 Fed. Cl. 328, 333, (Fed. Cl. 2022) (*"Cottingham II")*. "[T]he Federal Circuit's statement that a special master 'could' find reasonable basis based upon more than a mere scintilla does not mandate such a finding." *Cottingham II*, 159 Fed. Cl. at 333 (citing *Cottingham I*, 971 F.3d at 1346).

Furthermore, the issue of reasonable basis is not a static inquiry. The reasonable basis which existed when a claim was filed may cease to exist as further evidence is presented (which collectively casts doubt on a claim's objective basis when viewed in *toto*). *Perreira*, 33 F.3d at 1377. In *Perreira,* the Federal Circuit affirmed a special master's determination that reasonable basis was lost after Petitioner's "expert opinion, which formed the basis of the claim, was found to be unsupported by either medical literature or studies." *Id.* at 1376.

## II.     The Parties' Arguments

Petitioner maintains that the requisite good faith and reasonable basis exist in this case. Petitioner's Application for Final Attorney's Fees and Costs ("Motion") at 1-4, ECF No. 43. Regarding good faith, she insists that "[t]he claim was pursued by counsel following a due diligent investigation and upon a good faith legal analysis of the law and factual basis for the claim." *Id.* at 2. To establish reasonable basis, she cites medical record entries which she argues provide sufficient evidence that she suffered six months of sequelae of a GBS illness. She also cites a 2019 decision involving a determination by another special master that the lookback provision applied to a GBS claim, with onset outside the period required for a Table injury, to highlight the uncertainty regarding the applicability of the "look-back provision"[3] at the time of the Petition's filing. Motion at 2 (citing *Simpson v. Sec'y of Health & Hum. Servs.,* No. 17-0944V, 2019 WL 11815360 (Fed. Cl. Spec. Mstr. Aug. 7, 2019).

As evidence that her illness could be properly characterized as GBS, Petitioner emphasizes medical records from her first hospitalization showing the consideration of

---

[3] The lookback provision is the commonly used term for the exception to the usual statute of limitations which is allowed following a revision to the Vaccine Injury Table. Section 16(b). *See Clavio v. Sec'y of Health & Hum. Servs.,* No. 17-1179V, 2022 WL 1078175 (Fed. CL. Spec. Mstr. Feb. 16, 2022) (for a discussion of the relevant caselaw regarding the applicability of the lookback provision – specifically whether it applies to actual causation, as well as Table, claims).

4

GBS as a possible diagnosis, the inclusion of a round of IVIG therapy in her treatment, and the abnormal results of an EMG. Motion at 2 (citing Exhibits 4 at 40; 5 at 16, 21; 6 at 152). She insists the medical records show there was a lack of any alternative cause for her symptoms. Motion at 2-3.

Regarding the duration of her symptoms, Petitioner argues that her initial GBS symptoms were severe – requiring hospitalizations on two occasions with an intervening inpatient rehabilitation. Motion at 3-4. Maintaining that she continued to suffer severe migraines from a lumbar puncture she underwent during her first hospitalization (Exhibit 4 at 7[4]), Petitioner cites to symptoms reported in early February and late May 2013 – four and eight months post-vaccination (Exhibit 10 at 104, 46), as evidence that she continued to suffer residual effects of GBS. Motion at 3. Petitioner argues that "it is reasonable to infer that a GBS case requiring extensive hospitalization and in-patient rehabilitation would continue to produce residual effects for six months, and Petitioner's lay testimony is consistent with this reasonable inference." Motion at 3-4 (citing *James-Cornelius,* 984 F.3d at 1378-79[5]).

Opposing the motion for fees and costs in this case, Respondent insists that Petitioner "has failed to establish a reasonable basis for her claim." Respondent's Opposition to Petitioner's Motion for Fees and Costs ("Opp.") at 1, ECF No. 44. Respondent cites the lack of evidence that Petitioner suffered from GBS as alleged, or that she suffered residual symptoms for more than six months. *Id.* at 6-9. He also maintains that I have previously found reasonable basis lacking in cases involving an inability to meet the requirements of the Vaccine Act's lookback provision due to a dearth of injury evidence. Opp. at 8 (citing *Gumm v. Sec'y of Health & Hum. Servs.,* No. 19-0421V, 2020 WL 917050 9Fed. Cl. Spec. Mstr. Jan. 21, 2020 and *Bonsai v. Sec'y of Health & Hum. Servs.,* No. 19-0420V, 2020 WL 1503276 (Fed. Cl. Spec. Mstr. Feb. 20, 2020)).

In her reply, Petitioner discusses some of the recent caselaw regarding reasonable basis and the proper weighing of evidence. Petitioner's Reply to Opp. to Motion ("Reply") at 1-3, ECF No. 45. To counter Respondent's arguments regarding the nature of her injury, she again provides citations to the medical records from her first hospitalization. *Id.* at 3-7 (Exhibits 5 at 11-12, 15-16; 6 at 152; 10 at 133; 12 at 74). She discounts the caselaw cited by Respondent, arguing that those cases were dismissed not for an inability to meet the requirements of the Vaccine Act's lookback provision, but because of a lack

---

[4] This medical record is from a February 11, 2014 visit to her primary care provider ("PCP") regarding a possible ulcer. Exhibit 4 at 7. Thus, the citation appears to be erroneous.

[5] In her Motion, Petitioner provides a Westlaw citation for this decision. *See* Motion at 2, 4. However, the citation (2021 WL 68808) appears to be incorrect. *Id.* at 2.

5

of medical records reflecting any GBS diagnosis. Reply at 6.

When addressing the severity requirement, Petitioner emphasizes the assertions made in her affidavit regarding the severity and duration of her symptoms, insisting that her testimony "is corroborated by and is consistent with the medical record evidence of a severe neurological injury." Reply at 7. She argues that the opinion of the physician who treated Petitioner when she visited the emergency room on May 26, 2013 - that Petitioner's "examination [wa]s not consistent with Guillian barre" (Exhibit 10 at 63),[6] was meant to apply only to her chest pressure and right arm weakness, and not to the symptoms she reported in her lower extremities. Reply at 8-9 (citing Exhibit 11 at 46).[7] She provides additional citations to affidavits from herself and her mother - executed in January 2019 (Exhibits 19 at 2; 20 at 1) and to medical records regarding multiple complaints, including headache and migraine pain in July 2013 and January 2014 – ten and fifteen months post-vaccination (Exhibits 10 at 24; 18 at 18) and migraine and lower leg pain in October 2018 - more than six years post-vaccination (Exhibit 17 at 7-8). Reply at 8-11.

### III.     Medical Records and Other Evidence

The medical records show that Petitioner received the flu vaccine alleged as causal in this case while hospitalized from September 23-25, 2012. Exhibit 1 at 9. She had returned to the hospital several days after undergoing a laparoscopic Nissen fundoplication[8] on September 19th, complaining of abdominal pain and nausea thought to be caused by her failure to take her herpes simplex virus ("HSV") medication as instructed. Exhibits 4 at 21-22; 5 at 45.

Twenty-two years old and married with two small children at the time of vaccination (Exhibit 5 at 39), Petitioner suffered from prior conditions including "large volume reflux, fibromyalgia, HSV, chronic pain syndrome, migraine headaches, sleep disturbances, situational depression, [and] hypothyroidism." Exhibit 5 at 40; *see also* Exhibit 7 at 16 (report of increasing migraine headaches approximately nine months prior to vaccination

---

[6] Although Petitioner provided an incorrect citation to this entry, it appears that this is the statement she was referencing. *See infra* note 7.

[7] This citation is obviously incorrect, as Exhibit 11 contains only 11 pages. It appears that Petitioner meant to cite to Exhibit 10 at 46, which is one page from her May 2013 emergency room visit. Although the treating physician's statement is not found on page 46, the record is from Petitioner's May 26, 2013 emergency room visit.

[8] "A Nissen fundoplication is a surgery to treat gastroesophageal reflux disease (GERD). During the procedure, a surgeon creates a sphincter (tightening muscle) at the bottom of the esophagus to prevent acid reflux. Most people notice a significant decrease in acid reflux symptoms after the surgery." https://my.clevelandclinic.org/health/treatments/4200-nissen-fundoplication (last visited June 22, 2022).

- on January 19, 2012). She reported that she was experiencing marital difficulties at this time. *Id.* at 39.

Five days post-vaccination, Petitioner was again admitted to the hospital - this time complaining of lower extremity weakness and numbness which had worsened and developed into upper extremity weakness with some difficulty breathing. Exhibit 5 at 10. Assessed with likely GBS, Petitioner was admitted to the ICU, and neurology and pulmonary consultations were ordered. *Id.* at 11. However, the neurologist noted that Petitioner's "examination seems to be fluctuating, somewhat, since some physicians seem to have gotten deep tendon reflexes . . [and he could not] elicit any reflexes at present," adding that "I think there is some effort related component to her weakness." Exhibit 12 at 34. Additionally, the physician who first saw Petitioner believed her symptoms were due to a viral flare, similar to the Henoch-Schonlein Purpura[9] related one she suffered when a child which caused temporary lower extremity paralysis. Exhibit 5 at 13-14. And the results of a lumbar puncture, performed on October 1st, were normal. Exhibit 6 at 136. Still, after an EMG (performed on October 2nd) showed abnormal results "suggestive of a proximal polyradiculopathy such as may be seen in [GBS]" (Exhibit 4 at 40), Petitioner was prescribed five days of IVIG treatment. Exhibit 5 at 29.

Thereafter, Petitioner showed good improvement and was discharged to inpatient rehabilitation on October 9, 2012. Exhibit 5 at 5, 30-36. By the end of her inpatient rehabilitation – on October 20, Petitioner "ha[d] made tremendous progress with all activities . . . [and] was independent in all areas of self-care." Exhibit 10 at 135. At that time, Petitioner suffered from only some mild dizziness and a feeling of weakness in her bilateral lower extremities. *Id.*

Throughout this time, Petitioner's treating physicians continued to question her GBS diagnosis. On October 8th, for example, one neurologist considered whether Petitioner's condition should be characterized as GBS or toxic neuropathy. *Id.* at 36. The physician who discharged Petitioner to inpatient rehabilitation on October 9, 2012, noted that intermittently her knee reflexes were better than would have been expected with GBS. Exhibit 5 at 5. He expressed concern that Petitioner "might be having some secondary gain as she had been through a difficult marriage." *Id.*

On October 26, 2012, Petitioner returned to the emergency room with complaints of a migraine headache when she woke that morning and "[a]t approximately 4 p.m. th[at] evening . . . abrupt onset weakness of her legs where she could not walk unassisted."

---

[9] Henoch-Schonlein Purpura is a disorder causing inflammation and bleeding in the small blood vessels. *See* https://www.webmd.com/skin-problems-and-treatments/henoch-schonlein-purpura-causes-symptoms-treatment#1 (last visited on June 25, 2022).

Exhibit 10 at 129. After remarking on the atypical nature of Petitioner's symptoms during her first hospitalization as revealed by the lab results from that time, the treating physician opined that "[h]er current syndrome [wa]s also atypical in the rapid and abrupt onset of symptoms with motor and sensory disturbances." *Id.* at 131. Observing that Petitioner "complain[ed] significantly of a severe migraine but appear[ed] to be quite pleasant, talking in the room," he pondered whether a "[p]sychosomatic process [wa]s also possible." *Id.* Petitioner was admitted for close observation and prescribed medication for a possible urinary tract. *Id.* at 132. During this hospital stay, it was discovered that Petitioner had again been noncompliant with her HSV medication which was thought to be the cause of her symptoms. *Id.* at 124-27. The results of a lumbar puncture and nerve conduction were normal and unremarkable, respectively. *Id.* at 117. In the entry regarding her October 31, 2012 discharge, it was noted that Petitioner was "more ambulatory on the day prior to being discharged, . . . [but] was able to ambulate to the bathroom" at that time. *Id.* at 118.

On November 2, 2012, Petitioner visited the emergency room, complaining of a headache which began after her lumbar puncture five days earlier. Exhibit 18 at 9-11. She was diagnosed with a spinal headache and administered morphine, Zofran, and caffeine injections. *Id.* at 11-14.

Petitioner was thereafter not seen again by any medical treaters for three months, until February 4, 2013, when she visited the emergency room again for headache pain. Exhibit 6 at 107. A CT scan of her head revealed evidence of acute sinusitis. *Id.*

Three months later (and now nearly nine months post-vaccination), Petitioner was seen in the emergency room just before midnight on May 26, 2013, when she reported a tightness in the chest and stinging sensation in her hand which began earlier that evening and had progressed to a general feeling of overall weakness. Exhibit 10 at 57. During the physical examination, the treating physician described Petitioner as "in no acute distress and does not appear uncomfortable." *Id.* at 59. Although Petitioner indicated her symptoms felt close to what she had experienced the previous year when treated for GBS, the physician opined that her "examination [wa]s not consistent with [GBS]" and discharged Petitioner with a diagnosis of atypical chest pain. *Id.* at 63. There is nothing in this medical record to indicate the treating physician's findings applied only to the symptoms in Petitioner's chest and hand, and not to her feeling of overall weakness.

During the subsequent eight-month period, Petitioner was seen for headache and migraine pain on two occasions. On July 4, 2013, Petitioner visited the emergency room for a knot behind her left ear, a headache, blurred vision, and dizziness. Exhibit 10 at 23. The knot was determined to be a cyst, and Petitioner symptoms improved after two hours. *Id.* On January 25, 2014, Petitioner was seen for a migraine headache and light sensitivity

for approximately ten days, a three-day history of a cough, and a four-day history of body aches and weakness. Exhibit 18 at 18-19. Describing her symptoms as different than her prior symptoms of GBS, Petitioner specifically indicated she had "[n]o weakness in her arms or legs, no numbness, [and] no tingling." *Id.* at 23. Agreeing that he saw "[n]o signs or recurrent GBS," the treating physician opined that Petitioner's headache [wa]s an exacerbation of [her] underlying chronic migraines." *Id.* at 25.

Throughout the remainder of 2014 until early 2018, Petitioner received treatment for numerous conditions and illnesses including abdominal pain and nausea, ulcers, HSV, fibromyalgia, migraines, insomnia, illnesses such as the flu, viral gastroenteritis, and a cough, amphetamine use, a rash, vision loss, follow-up after a car accident, and sinus disease. Exhibits 4 at 3-13, 33-39, 44-49; 6 at 14-97; 8 at 3-49. There are no reports of weakness, pain, or tingling in her legs or other GBS-related symptoms in the medical records from any of these visits.

On October 5, 2018 – more than six years post-vaccination and almost seven months after the Petition was filed - Ms. Etheridge visited a new neurologist, complaining of persistent and constant weakness in her legs since suffering GBS in 2012. Exhibit 17 at 6. She reported that she had developed migraine-like headaches during her GBS which continued periodically, "at least once a week on average." *Id.* Observing that Petitioner's pain was "more of a deep soft tissue pain than a superficial neuropathic pain," the neurologist indicated that the relationship of this current pain to Petitioner's previous GBS "[wa]s uncertain." *Id.* at 8. He added that "[s]ome exam findings might suggest some radiculopathy." *Id.*

In early January 2019, Petitioner and her mother executed affidavits describing ongoing headaches, weakness, fatigue, and pain which they attribute to the GBS illness Petitioner is alleged to have suffered in October 2012. Exhibits 19-20.

## IV.    Analysis

Although insufficient to satisfy the greater burden of proof required to establish entitlement, the minimal evidence of a possible GBS illness contained in the medical records from Petitioner's first hospitalization and potential applicability of the Vaccine Act's lookback provision provide a rationale for filing this claim despite its untimely nature. It is unlikely, but still feasible, that Petitioner may have successfully shown that her injury met the requirements for a Table GBS or that she was entitled to the protection afford by the lookback provision even if her GBS did not satisfy all Table elements. However, even if there is a scintilla of proof regarding Petitioner's alleged injury, the record does not objectively establish six months sequelae – meaning reasonable basis did not exist on this matter.

Petitioner maintains that, since her vaccination, she "ha[s] experienced symptoms of Guillain-Barre Syndrome, including numbness, weakness, headaches, and fatigue." Exhibit 2 at ¶ 5; *accord.* Exhibit 19 at ¶ 10. She insists that her assertions of a severe GBS illness; continued GBS symptoms – specifically in February, May, and July 2013, January 2014, and October 2018; and the lack of any alternative cause for her symptoms; are collaborated by and consistent with the medical records evidence in this case. Motion at 2-3; Reply at 7. However, a review of the medical records reveals that Petitioner's claims are not supported and often refuted by the information contained therein.

Although Petitioner attributes the totality of her hospitalizations and intervening inpatient rehabilitation to vaccine caused GBS, the contemporaneously-created medical records do not preponderantly establish the existence of a severe and ongoing GBS illness. Indeed - GBS was only considered a *possible* diagnosis for Petitioner's symptoms during her first hospitalization. But the record shows that thereafter it was questioned during her subsequent inpatient rehabilitation, and ultimately thought to be an incorrect diagnosis by her second hospitalization, approximately one-month post-vaccination.

By the end of her inpatient rehabilitation on October 20, 2012, Petitioner showed only mild symptoms. And, although she experienced an acute onset of further symptoms in late October 2012, those symptoms were thought to be due to her repeated non-compliance with her HSV medication and/or the UTI she was experiencing. No treating physician posited that they current condition may be due to GBS. And Petitioner was reported to be independently ambulating by her October 31st discharge. When she returned to the hospital on November 2nd, less than 40 days post-vaccination, she complained of only migraine pain which improved during her emergency room visit.

Furthermore, there is *no* evidence to link the symptoms Petitioner reported and illnesses she suffered in 2013 and later with the symptoms that she experienced during her first hospitalization in October 2012. Neither Petitioner *nor* any treating physician attributed her later complaints of headache and migraine pain, in February and July 2013, as well as January 2014, to her October illness or the lumbar puncture she underwent in late October 2012. And the medical records show that Petitioner experienced chronic migraine pain both before and after vaccination. Similarly, there is nothing in the medical record from Petitioner's May 2013 visit to the emergency room to suggest that the opinion of the treating physician – that Petitioner symptoms were unrelated to her earlier GBS illness, was limited to only some of the symptoms she was experiencing. During her January 2014 visit, Petitioner specifically indicated her symptoms were different than those she suffered in October 2012, and reported no weakness, pain, or tingling in her arms or legs.

10

In addition, despite Petitioner's assertion that there were no alternative causes for her reported symptoms, the medical records contain numerous instances when potential alternative causes were discussed and determined to the more likely cause of Petitioner's symptoms. It was noted that Petitioner had suffered a similar episode of lower extremity paralysis connected to her diagnosis of Henoch-Schonlein Purpura when a child (Exhibit 4 at 23), experienced a UTI in late October 2012, and sinusitis in February 2013, was often non-compliant with her HSV medication – a failure which could result in periodic viral flares, and experienced frequent migraines both before and after vaccination. Additionally, multiple different treating physicians indicated they believed at least some of Petitioner's symptoms were psychosomatic in nature.

Petitioner's later complaints of ongoing leg pain and weakness, as well as periodic migraine-like pain, were made in October 2018 – *almost six years* after her hospitalization for leg pain, weakness, and numbness, and difficulties walking; more than six months after the Petition was filed; and more than four months after Petitioner was ordered to provide additional evidence to show six-months sequelae, *See* Order, issued June 7, 2018), ECF No. 11 (following the initial status conference held on May 21, 2018). Thus, it is more properly characterized as a *current* assertion made by Petitioner contemporaneously with the advancement of this claim - and therefore the kind of assertion not typically given much weight, if any. *See* Section 13(a)(1) (instructing that a special master may not find compensation appropriate "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion"). Even the neurologist Petitioner seen at this visit – who had not previously treated Petitioner, questioned any connection between Petitioner's current leg pain and the GBS symptoms she suffered in 2012.

Petitioner has failed to provide *any* evidence to support her current claim of GBS sequelae beyond November 2012 – less than two months post-vaccination. The evidence even establishing the existence of GBS is itself weak, but even if it is supported by a scintilla of evidence, the greater record establishes either that (a) the GBS had resolved long before the end of the six-month period, or (b) sequelae experienced after the fall of 2012 are unrelated. Thus, she has failed to meet the lower standard required to establish a reasonable basis for her claim, and an award of attorney's fees and costs is not appropriate in this case.

### V.     Conclusion

The Vaccine Act permits an award of reasonable attorneys' fees and costs even to an unsuccessful litigant as long as the litigant establishes the Petition was brought in good faith and there was a reasonable basis for the claim for which the Petition was brought. Section 15(e)(1). In this case, Petitioner has not established there was a

reasonable basis for filing her claim. **Petitioner's motion for attorney's fees and costs is <u>DENIED</u>.**

The Clerk of the Court is directed to enter judgment in accordance with this decision.[10]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.